**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HANNAH O'BRIEN,

Plaintiff,

-vs-

OLD MISSION PENINSULA SCHOOL, a Michigan public school academy, and CHARTER HR EDUCATIONAL SERVICES, LLC, a Michigan limited liability company.

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

CASE NO.

HON.

---

PARKER HARVEY, PLC
Anders J. Gillis (P77818)
Todd W. Millar (P48819)
Attorneys for Plaintiff
901 S. Garfield Avenue, Suite 200
Traverse City, Michigan 49686
(231) 929-4878
agillis@parkerharvey.com
tmillar@parkerharvey.com

---

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in this Complaint.*

NOW COMES the Plaintiff, Hannah O'Brien, by and through her attorneys, Parker Harvey, PLC, and for her Complaint against Defendants Old Mission Peninsula School ("OMPS"), a Michigan public school academy, and Charter HR Educational Services, LLC ("CHRES"), a Michigan limited liability company, states as follows:

## NATURE OF THE ACTION

1. Hannah O'Brien is a devoted mother and widely praised elementary music teacher who was removed from her classroom and damaged in her career because a public school punished her for expressing, from her own home and on her own time, a political viewpoint she had the same right to hold and voice as anyone else.

2. This case concerns a public institution's use of employment authority to punish a citizen-employee for off-duty political speech on matters of public concern.

3. The First Amendment does not belong to the political majority.

4. Free speech is easiest to defend when it is polite, popular, and shared by those in power.

5. But the First Amendment often matters most when a citizen expresses a political view that government officials, coworkers, or others dislike.

6. This case is not about whether Plaintiff Hannah O'Brien's words were tactful, universally accepted, or beyond criticism.

7. This case is about whether a public-school academy may use public authority to remove a teacher from her classroom, professionally stigmatize her, and impair her career because her off-duty political opinions offended others.

8. On February 9, 2026, an adult individual, Isaiah Moger, who had recently protested on Old Mission Peninsula School grounds with an anti-Trump sign, returned to Old Mission Peninsula School carrying a hammer.

9. During school hours, Moger smashed his way into the elementary school and vandalized the lobby with anti-Trump and anti-ICE graffiti.

10. Meanwhile, children and teachers remained inside the school and parents who were not at the school were alerted to the attack.

11. Ms. O'Brien, a beloved, thirty-year-old part-time music teacher at the school, was not working that day.

12. Ms. O'Brien's three-year-old son, however, was inside the school and placed in lockdown.

13. When the attack happened, Ms. O'Brien did not know whether her son was safe.

14. The attack was a public event involving issues of political violence, the security of a publicly funded elementary school, the adequacy of precautions taken after earlier warning signs, and the response of public officials.

15. The attack received public news coverage and was the subject of public discussion.

16. Two days later, on February 11, 2026, while off duty and inside her own home, Ms. O'Brien participated through her personal Facebook account in a public discussion of a news report concerning the attack. **See Exhibit A**.

17. In response to a question about the attacker's motive, Ms. O'Brien wrote, among other things, that Moger "was an anti-ICE anti-Trump protestor on school grounds Friday" and expressed her personal political opinion that "liberals are the most violent." **See Exhibit B**.

18. Ms. O'Brien's characterization of the attacker's apparent political motive was part of ongoing public debate about the incident. **See, e.g., Exhibit C** (examples of other public comments on the attacker's motive).

19. Ms. O'Brien's statement that "liberals are the most violent" was blunt, personal, political, and debatable, and Ms. O'Brien recognized and respected that others were free to criticize it, reject it, or respond with views of their own. **See Exhibit B**.

20. Ms. O'Brien did not share her opinion in her classroom, through a school account, or pursuant to any teaching responsibility.

21. Ms. O'Brien did not claim to represent OMPS while making her comments.

22. Ms. O'Brien's comment disclosed no student information, confidential record, or fact obtained through the performance of her job that was not already publicly available and disseminated.

23. Ms. O'Brien spoke as a citizen, a parent, a politically conservative woman, and the mother of a three-year-old son who had just been placed in danger and traumatized by a serious criminal attack on his public elementary school.

24. Within one day, Defendants removed Ms. O'Brien from teaching and ordered her not to return to work.

25. Defendants' disciplinary memorandum expressly identified Ms. O'Brien's Facebook comments as the basis for the action. **See Exhibit D**.

26. Defendants' disciplinary memorandum accused Ms. O'Brien of expressing opinions "harmful to the school's mission[,]" gave her 24 hours to choose between resigning or signing a Last Chance Agreement that burdened future speech and placed her continued employment at risk, and provided a disclaimer that the disciplinary action was "not intended" to prevent Ms. O'Brien from exercising her First Amendment rights.

27. That disclaimer underscored that Defendants understood Ms. O'Brien's speech implicated First Amendment rights, but the discipline still treated the content and viewpoint of her speech as misconduct.

28. The disclaimer did not change the substance of what Defendants did: discipline Ms. O'Brien for her political viewpoints and the content of her speech.

29. Ms. O'Brien refused to resign or sign the punitive Last Chance Agreement and remained willing to return to teaching without signing an agreement that treated her political speech as punishable misconduct.

30. The Defendants then made the operative decision: they prohibited Ms. O'Brien from returning to her classroom or school property for teaching, controlled her access even to her own belongings, and determined to continue with her exclusion from teaching responsibilities.

31. Defendants kept Ms. O'Brien nominally employed and paid while making it impossible for her to perform her job.

32. Paid administrative leave did not cure the retaliation and instead prolonged Ms. O'Brien's exclusion, fueled public speculation about her disappearance, and left her carrying the professional stigma.

33. OMPS cannot avoid constitutional accountability by placing a private human-resources company between the Board and the teacher, especially when the contractual relationship with CHRES allowed OMPS to maintain significant influence and/or power over employment decisions.

34. OMPS exercised governmental authority over the public school, the campus, the classroom, and whether Ms. O'Brien could return.

35. CHRES participated in and implemented the discipline through what amounted to an integrated employment structure created to staff the school.

36. Michigan law provides a separate and complementary protection for political activities, publications, or communications of non-employment activities.

37. MCL 423.508 prohibits an employer from gathering or keeping records concerning an employee's political activities, publications, or communications of non-employment activities, absent written authorization and narrow exceptions.

38. Defendants did precisely what MCL 423.508 prohibits.

39. To Ms. O'Brien's knowledge, employees who expressed or held more progressive or liberal political viewpoints were not removed from school, placed on Last Chance Agreements, or subjected to comparable discipline for their off-duty political opinions.

40. Under MCL 423.508, an employer may not treat one political viewpoint as acceptable civic participation while gathering, preserving, and using another viewpoint as the basis for discipline.

41. The damage did not end when Ms. O'Brien's work at OMPS ended.

42. Ms. O'Brien sought another public-school teaching position with Elk Rapids Schools and successfully completed its interview and teaching-demonstration process.

43. After checking Ms. O'Brien's references, Elk Rapids offered her its third-grade teaching position, Ms. O'Brien accepted the offer, and the school internally announced Ms. O'Brien as its new third-grade teacher, stating that her hiring would become official upon Board approval.

44. Shortly thereafter, Elk Rapids officials received additional information concerning Ms. O'Brien's nonpersonal leave from OMPS and learned that she was represented by counsel.

45. The anticipated hiring did not proceed, her offer was rescinded, and Elk Rapids subsequently reopened the same third-grade vacancy.

46. Defendants' actions, therefore, have deprived Ms. O'Brien not only of her OMPS classroom, but also of compensation, professional standing, future earning capacity, and a significant opportunity to advance her career.

47. If a public charter school may remove an educator for expressing an unpopular and personal political opinion from her own home, preserve that opinion in a disciplinary file, and limit her employment without evidence that she was unable to perform her job, then every public employee speaks under the threat that the prevailing political sentiment within the workplace will determine which views are safe to express.

48. The First Amendment and Michigan law permit individuals to disagree with Ms. O'Brien and permit coworkers to take offense at her viewpoints and speech.

49. But governmental power may not be used to impose viewpoint-based professional punishment without a sufficiently weighty operational justification, and an employer may not gather or keep records of an employee's protected off-duty political activities except as permitted by MCL 423.508.

50. Further, if a public school may punish the mother of a child victimized by a politically expressive attack for discussing that attack and expressing an unpopular political opinion from her own home, then public employees must speak under the threat that workplace officials will determine which political viewpoints victims and their families may safely express.

**PARTIES, JURISDICTION, & VENUE**

51. Plaintiff Hannah O'Brien is a resident of Grand Traverse County, Michigan.

52. Ms. O'Brien is an elementary music educator and the parent of young children, including a child who attended Old Mission Peninsula School during the events described below.

53. Defendant Old Mission Peninsula School ("OMPS" or the "School") is a Michigan public school academy located in Grand Traverse County.

54. Under MCL 380.501, a Michigan public school academy is a body corporate and governmental agency.

55. OMPS is governed by its public Board of Directors ("Board").

56. OMPS publicly describes itself as a tuition-free, public charter school.

57. OMPS's Board makes governance decisions, sets policy, and is responsible for ensuring that OMPS complies with its charter and applicable law.

58. Defendant CHRES is a Michigan limited liability company that contracted with OMPS to provide employment, payroll, benefits, and personnel services for teachers and other employees assigned to OMPS.

59. Under an agreement between OMPS and CHRES: (a) OMPS was a public school academy under the direction of the Board; (b) CHRES employees assigned to OMPS were designated agents of OMPS for purposes of access to educational records; (c) compensation was established and funded through OMPS; (d) OMPS's chief administrator served as the liaison to the Board on employment matters; and (e) CHRES was required to consult with OMPS administration before formal disciplinary or termination action.

60. Although CHRES was the employer identified on Ms. O'Brien's written employment documents, OMPS officials and the Board exercised direct authority and significant influence over whether she could enter OMPS property, teach OMPS students, and return to the only worksite and position for which CHRES employed her.

61. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Ms. O'Brien asserts claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

62. This Court has supplemental jurisdiction over the related Michigan-law claim under 28 U.S.C. § 1367 because it arises from the same nucleus of operative facts.

63. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside or conduct business in this District and a substantial part of the events occurred in Grand Traverse County.

64. Grand Traverse County lies within the Southern Division of the Western District of Michigan.

## FACTUAL ALLEGATIONS

### A. OMPS Retained Oversight and Participated in CHRES Staffing Arrangements.

65. OMPS and CHRES maintained a staffing arrangement in which OMPS retained meaningful oversight and control over personnel assigned to Old Mission Peninsula School.

66. OMPS and CHRES's agreement with one another required CHRES to employ and assign classroom teachers, instructors, administrators, and support staff consistent with the Board-approved budget and OMPS's educational mission.

67. OMPS helped establish employee compensation through its budget, reimbursed CHRES for payroll and benefits, oversaw implementation of personnel policies, and remained informed and involved concerning employment matters through its chief administrator.

68. The agreement required CHRES to consult with the OMPS chief administrator concerning hiring, evaluation, supervision, discipline, and termination before formal action was taken.

69. The agreement allowed OMPS to submit written dissatisfaction reports, propose remedial action, and request any specific action concerning a CHRES employee assigned to OMPS.

70. The agreement also required CHRES to perform its duties consistently with all applicable civil-rights laws.

71. The relationship between Defendants was therefore not a structure in which a private employer made a wholly independent employment decision unrelated to public authority.

72. The OMPS Board did not merely acquiesce in an independently made CHRES employment decision.

73. The OMPS Board itself helped determine whether Ms. O'Brien could enter OMPS property, return to teaching, and perform the position for which CHRES employed her.

74. The OMPS Board also controlled whether Ms. O'Brien would have access to school property, her classroom, and her personal belongings.

75. The OMPS Board's prohibition made it impossible for Ms. O'Brien to perform the public-school teaching position for which she remained employed and ready to work.

76. The specific deprivation challenged here (i.e., the prohibition against Ms. O'Brien teaching at or entering the public school) was ordered, approved, or ratified by OMPS through its Board, while CHRES participated in and implemented the leave, disciplinary process, Last Chance Agreement, and resulting employment consequences.

77. The OMPS Board's decision regarding Ms. O'Brien was an official decision by the governing body with final authority over OMPS policy, school access, and whether Ms. O'Brien could perform the public-school work for which she had been assigned.

**B. The Politically Charged Attack and Threat to Ms. O'Brien's Child.**

78. On Friday, February 6, 2026, Isaiah Moger appeared on school grounds during morning drop-off displaying an anti-Trump protest sign and engaging in conduct that staff and law enforcement regarded as erratic and highly disruptive.

79. OMPS leadership told the school community that the situation was being addressed and precautions were being taken.

80. On Monday, February 9, 2026, Ms. O'Brien, who was a part-time teacher at the same school but was not scheduled to work that day, dropped off her preschool-aged son for school at OMPS.

81. During the drop-off, law enforcement was present to ensure safety.

82. Later that morning, after law enforcement had departed, Moger returned with a hammer.

83. While students were in the elementary school, Moger smashed his way into the school and vandalized the lobby with anti-Trump and anti-ICE graffiti.

84. The attack resulted in a lockdown of the elementary school, leaving students and teachers, including Ms. O'Brien's son, frightened and distressed.

85. When Ms. O'Brien learned that the school was in lockdown, she did not know whether her child was safe.

86. For Ms. O'Brien, the attack was therefore both a public event and a deeply distressing personal threat to her child.

87. The attack received extensive public news coverage.

88. Its political character, the security of a publicly funded elementary school, the adequacy of the security precautions, and the response of public officials were matters of legitimate public debate.

89. The Grand Traverse Prosecutor's Office subsequently charged the attacker with a terrorism-related felony and a felony count of malicious destruction of property, reflecting the seriousness and terror-producing nature of the alleged conduct.

90. Under Michigan law, a crime victim includes an individual who suffers direct or threatened physical or emotional harm because of a crime. MCL 780.752(1)(m).

91. Ms. O'Brien's young child was, therefore, a victim of the attack, and Ms. O'Brien was entitled as his parent to exercise the rights afforded to the parent of a minor victim.

92. Ms. O'Brien, therefore, spoke not only as a citizen and educator, but as the mother of a young child who had been placed in danger and traumatized by a violent, politically driven incident.

**C. Ms. O'Brien Speaks as a Citizen on Matters of Public Concern.**

93. Moger's attack was a subject of significant public interest and it was covered extensively by the media, including reports by MLive, the Detroit Free Press, WPBN, and the Traverse Record-Eagle.

94. On Wednesday, February 11, 2026, UpNorthLive, a media outlet, published a news report concerning the attack.

95. On February 11, 2026, Ms. O'Brien commented online on the UpNorthLive story from her personal account in a public Facebook discussion of the news report.

96. In response to a question concerning the attacker's motive, Ms. O'Brien wrote: "[He] was an anti-ICE anti-Trump protestor on school grounds Friday, liberals are the most violent."

97. In a follow-up comment, she wrote: "[B]y what he did some think he wanted to be on display[.] And some think he was just having a mental episode and there's no explanation."

98. Ms. O'Brien's comments conveyed her personal and conservative political viewpoint.

99. Ms. O'Brien's comment addressed political violence, the apparent motive for an attack on a public school, public safety, and the protection of her own child.

100. Ms. O'Brien did not make the post pursuant to any teaching duty.

101. Ms. O'Brien did not speak in a classroom, use a school account, claim to represent OMPS in the post, or disclose student records or confidential investigative material.

102. The information Ms. O'Brien referenced was already publicly available, discussed, and had been openly communicated within the community.

103. Ms. O'Brien's political characterization was her opinion.

104. The First Amendment protects the right of others to condemn, disagree, or debate Ms. O'Brien's words, but it does not authorize the government to impose punishment because the viewpoint offended coworkers or officials.

**D. Defendants Responded to Speech with Punishment, Not Evidence of Disruption.**

105. Later that day on February 11, 2026, staff met concerning the attack.

106. Employees expressed fear, anger, and frustration concerning the adequacy of the safety measures and communications preceding the break-in.

107. Ms. O'Brien spoke as both a parent and educator about the terror of learning that her young child was locked down inside the school and her concern that additional precautions had not been taken after the earlier warning signs.

108. The next day, February 12, 2026, CHRES's Human Resources representative instructed Ms. O'Brien not to report to work.

109. Defendants later cancelled a scheduled meeting after Ms. O'Brien asked about its purpose and whether counsel should be present.

110. Instead, a CHRES human resources representative delivered disciplinary paperwork and required Ms. O'Brien to choose between resigning or signing a Last Chance Agreement.

111. The proposed Last Chance Agreement effectively treated Ms. O'Brien's off-duty speech and opinions as misconduct, required additional restrictions concerning future public discussion of school matters, and placed her continued career at risk for any alleged future violation.

112. Defendants expressly tied the discipline to the Facebook comments.

113. Ms. O'Brien was told that at least one employee considered the comment offensive.

114. A disciplinary memorandum provided to Ms. O'Brien claimed that the action was "not intended" to prevent Ms. O'Brien from exercising her First Amendment rights.

115. Ms. O'Brien did not resign.

116. Ms. O'Brien rejected the false choice to be punished for her political speech and opinions and offered that she was ready and willing to return to work without signing the Last Chance Agreement.

117. Defendants responded that her return depended upon signing the Last Chance Agreement.

118. Defendant OMPS prohibited Ms. O'Brien from returning to teach and restricted her access to the school property, the classroom, and personal belongings.

119. CHRES continued to administer her paid leave and resulting employment status.

120. At the time Defendants removed and disciplined Ms. O'Brien, they had identified no disruption to classroom instruction, student services, Ms. O'Brien's teaching performance, or the operation of her music program sufficient to justify the punishment imposed.

121. The concerns identified after the fact consisted primarily of subjective offense, rumors, and alleged anxiety arising after Ms. O'Brien had already been removed from the School.

122. On information and belief, other employees working at OMPS have repeatedly expressed progressive or liberal political viewpoints, such as anti-ICE and anti-Trump opinions, without being removed from campus, placed on a Last Chance Agreement, or subjected to comparable discipline.

### E. Defendants' Actions Damaged Ms. O'Brien's Employment and Career.

123. By barring Ms. O'Brien from OMPS, placing her on administrative leave, and treating her political speech as misconduct, Defendants damaged Ms. O'Brien's reputation and career.

124. Defendants' actions created public and professional stigma around Ms. O'Brien's absence from the classroom.

125. Parents and community members noticed her disappearance and contacted her or others to ask whether she was ill, dead, or otherwise unable to work.

126. Ms. O'Brien sought to mitigate her damages by applying for a teaching position with Elk Rapids Schools.

127. Ms. O'Brien progressed through Elk Rapids' interview process, including teaching demonstrations, and Elk Rapids then checked her references.

128. On or about June 29, 2026, after checking those references, Elk Rapids offered Ms. O'Brien its third-grade teaching position at Lakeland Elementary School, and Ms. O'Brien accepted.

129. Elk Rapids thereafter internally announced Ms. O'Brien as its new third-grade teacher and advised staff that the hiring would become official upon Board approval.

130. After the offer and acceptance, Elk Rapids officials received additional information concerning Ms. O'Brien's leave from OMPS.

131. In contemporaneous communications, Elk Rapids officials specifically confirmed that the matter did not involve inappropriate contact with a child or staff member, discussed whether Ms. O'Brien's leave was disciplinary or administrative, and were informed that the leave was not personal and that Ms. O'Brien had legal counsel.

132. The previously accepted hiring did not proceed and the offer was rescinded.

133. On or about July 9, 2026, Elk Rapids directed that the same upper-elementary vacancy be reposted, with its Superintendent confirming that it remained the vacancy that Ms. O'Brien had previously been selected to fill.

134. The loss of the Elk Rapids position demonstrates that Defendants' actions did not remain confined to Ms. O'Brien's existing classroom at OMPS but impaired her ability to obtain other public-school employment and caused substantial lost compensation, benefits, earning capacity, and professional opportunity.

135. Music-education positions, particularly positions compatible with raising young children in northwest lower Michigan, are limited.

136. Ms. O'Brien has lost the opportunity to move into a full-time public-school role with greater pay, benefits, experience, and future advancement.

137. As a direct and proximate result, Ms. O'Brien has suffered and will continue to suffer lost wages and benefits, including losses associated with the accepted Elk Rapids teaching position, lost earning capacity, reputational injury, emotional distress, humiliation, and other economic and noneconomic damages.

## COUNT I
## FIRST AMENDMENT RETALIATION & VIEWPOINT DISCRIMINATION
## 42 U.S.C. § 1983

**(Against All Defendants)**

138. Ms. O'Brien incorporates the preceding allegations as though fully restated.

139. The First Amendment protects public employees when they speak as citizens on matters of public concern, subject only to restrictions necessary to permit the governmental employer to operate efficiently and effectively. *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Lane v. Franks*, 573 U.S. 228 (2014).

140. Ms. O'Brien spoke as a citizen and parent, outside her official duties, from her home, on political motive, political violence, her personal political opinions, public-school security, and the safety of her child.

141. The content, form, and context of the speech by Ms. O'Brien establish that it addressed matters of public concern.

142. Defendants subjected Ms. O'Brien to adverse actions that would deter an ordinary person from speaking, including removal from teaching, indefinite leave, compelled choice

between resignation and a Last Chance Agreement, restrictions on school and property access, refusal to permit her return, professional stigma, and the ultimate end of her employment.

143. Ms. O'Brien's speech and viewpoints were a substantial or motivating factor in those actions.

144. Defendants expressly identified Ms. O'Brien's Facebook speech, described offense at its content, and conditioned her return on acceptance of the Last Chance Agreement.

145. Defendants lacked an adequate or legal governmental justification.

146. Ms. O'Brien disclosed no confidential information, did not speak through school channels, did not disrupt instruction, and remained able and willing to perform her duties.

147. Subjective offense, political disagreement, or generalized anticipated controversy, without a reasonable and sufficiently weighty showing of operational disruption, did not outweigh Ms. O'Brien's citizen-speech interests.

148. Defendants also discriminated on the basis of viewpoint by imposing severe discipline on Ms. O'Brien's conservative political speech while tolerating comparable off-duty political expression from employees holding more progressive viewpoints.

149. Defendants imposed an unconstitutional condition by requiring Ms. O'Brien to accept a punitive agreement burdening future speech and placing her career in jeopardy as the price of returning to public-school employment.

150. OMPS acted under color of state law.

151. Michigan law identifies a public-school academy as a governmental agency, and the OMPS Board directly ordered, approved, or ratified Ms. O'Brien's exclusion and the refusal to permit her return.

152. OMPS did not merely approve conduct independently undertaken by CHRES. It made the operative decision with CHRES that Ms. O'Brien could not return to her public-school classroom and would remain excluded despite her willingness to resume teaching.

153. Because OMPS possessed final policymaking authority for OMPS concerning school access and Ms. O'Brien's ability to return to OMPS, its deliberate decision constituted official OMPS policy and was a moving force behind the constitutional deprivation.

154. CHRES acted under color of state law because it was a willful participant in joint activity with OMPS concerning the challenged discipline: it consulted and coordinated with OMPS administration, placed Ms. O'Brien on leave, issued the disciplinary memorandum and Last Chance Agreement, and administered the resulting employment consequences while the Board prohibited her return.

155. Acting through personnel possessing authority concerning Ms. O'Brien's employment, CHRES imposed leave, issued the discipline and Last Chance Agreement, and initially conditioned her return upon execution of that agreement.

156. On information and belief, the challenged CHRES decisions were made, approved, or ratified by CHRES personnel possessing final authority over Ms. O'Brien's discipline, leave, and employment status and therefore constituted official CHRES policy rather than merely unauthorized conduct by subordinate employees.

157. Alternatively, even if CHRES is not deemed a state actor, OMPS remains liable because its Board used governmental authority over the public school to cause and maintain the adverse employment action.

158. A governmental entity may not accomplish through a private staffing arrangement what it could not constitutionally do directly.

159. A public employer may not retaliate against an employee for citizen speech on a matter of public concern based solely on disagreement, offense, or generalized anticipated controversy, without a legitimate and sufficiently weighty showing of operational disruption.

160. As a direct and proximate result, Ms. O'Brien suffered the damages described above and is entitled to compensatory relief, equitable and declaratory relief, punitive damages to the extent permitted by law, and attorney fees and costs under 42 U.S.C. § 1988.

**COUNT II**
**BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT,**
**MCL 423.501 ET SEQ.**
**(Against All Defendants)**

161. Ms. O'Brien incorporates the preceding allegations as though fully restated.

162. CHRES was Ms. O'Brien's formal employer.

163. OMPS was also an employer, joint employer, and/or agent of the employer within the meaning of MCL 423.501 because it controlled or exercised significant control over Ms. O'Brien's worksite, access, duties, continued assignment, discipline, and ability to return to teaching and therefore acted, at minimum, as an "agent of the employer" under MCL 423.501(2)(b).

164. MCL 423.508 prohibits an employer from gathering or keeping a record of an employee's political activities, publications, or communications of nonemployment activities unless the employee provides written authorization or the narrow on-premises/working-hours exception applies.

165. Ms. O'Brien's Facebook comments were political publications and communications of nonemployment activities.

166. Ms. O'Brien made her political comments from home, while off duty, through a personal account.

167. Ms. O'Brien did not authorize Defendants in writing to gather or keep her political comments.

168. Defendants gathered, captured, retained, circulated, and used records of Ms. O'Brien's personal political comments to investigate her, prepare discipline, impose administrative leave, condition her return on a Last Chance Agreement, and bar her from OMPS.

169. Defendants' claim that others later took offense does not transform an off-duty political communication into on-duty conduct.

170. Defendants' violation of Ms. O'Brien's rights under MCL 423.508 was willful and knowing.

171. Defendants deliberately used Ms. O'Brien's off-duty political record as the express basis for discipline.

172. As a direct and proximate result, Ms. O'Brien suffered actual damages, including reputational harm, lost employment opportunities, and emotional damages, and is therefore entitled to an order compelling compliance and an expungement of improper documents in her personnel file, actual damages, statutory damages, costs, and reasonable attorney fees under MCL 423.511.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Hannah O'Brien requests that the Court enter judgment in her favor and against the appropriate Defendant or Defendants and:

A. Declare that Defendants violated Ms. O'Brien's rights under the First Amendment, as applied to state and local governmental actors through the Fourteenth Amendment;

B. Declare that Defendants violated Ms. O'Brien's rights under the Bullard-Plawecki Employee Right to Know Act, including MCL 423.508;

C. Award actual, compensatory, and nominal damages in an amount to be determined at trial, including past and future lost wages and benefits, lost earning capacity, losses arising from lost employment opportunities, reputational injury, emotional distress, humiliation, and all other proven economic and noneconomic damages;

D. Award all statutory damages available under MCL 423.511;

E. Award punitive damages against CHRES to the extent permitted by law;

F. Grant appropriate injunctive and equitable relief, including an order compelling compliance with MCL 423.508, thereby expunging or removing the challenged discipline and unlawfully maintained political-activity records from Ms. O'Brien's personnel and disciplinary files, correcting her employment records, and preventing the further unlawful maintenance or use of those records;

G. Award prejudgment interest to the extent permitted by law and post-judgment interest at the applicable statutory rate;

H. Award reasonable attorney fees and costs under 42 U.S.C. § 1988 and MCL 423.511; and

I. Award all other legal and equitable relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 27, 2026

PARKER HARVEY, PLC
Anders J. Gillis (P77818)
Todd W. Millar (P48819)
Attorneys for Plaintiff
901 S. Garfield Avenue, Suite 200
Traverse City, Michigan 49686
(231) 929-4878
agillis@parkerharvey.com
tmillar@parkerharvey.com

# EXHIBIT A

UpNorthLive

The man accused of using a hammer to break into Old Mission Peninsula School is being held on a $1 million bond on charges of false report or threat of terrorism and malicious destruction of personal property $1,000-20,000.

He's been identified as Isaiah Moger, 41.

Grand Traverse County Prosecuting Attorney Noelle Moeggenberg said the significant bond is based on the seriousness of the offense.

DETAILS: https://upnorthlive.com/.../1-million-bond-set-for-man...




200 · 33 comments · 19 shares

Like · Comment

# EXHIBIT B

**Caitlin Dennis**
Does anyone know WHY he did it? Because the news wont say ...

Reply

**Hannah OBrien**
Caitlin Dennis he was an anti-Ice anti- Trump protestor on school grounds Friday, liberals are the most violent

Reply 1

**Hannah OBrien**
Caitlin Dennis by what he did some think he wanted to be on display
And some think he was just having a mental episode there's no explanation

Reply

Most relevant is selected, so some replies may have been filtered out.

# EXHIBIT C

Christina Needham
Why...is the question?!?!?
23w 1

R Brian Rogers
Friend of the Court and Recent Med Change
23w 1

Dan Blake
R Brian Rogers when this situation first came to light I had seem something where the school refused to release his children to him so he went back to his vehicle and retrieved the hammer.
23w 1

Alan Kierczynski
R Brian Rogers No. Political activism and mental illness.
23w

**Tim Wolf**

So, for God's sake, somebody cough up the motive, will you please?!?!?

Reply 6

**Alan Kierczynski**

Tim Wolf TDS

Reply 1

**Tim Wolf**

TDS means......?!?!?!?

Reply

**Paul Cohen**

Tim Wolf Trump Denial Syndrome!!

Reply

# EXHIBIT D

**Summary**

On Thursday, February 12, 2026 you were contacted by Joy Stehlik informing you that you were to be placed on paid administrative leave due to a recent post on UpNorth Live's Facebook page.

On February 13, based on your request, Chris Stoddard contacted you to inform you that the suspension was not intended to prevent you from exercising your First amendment rights.

In the review you made the following post in response to a post on a UpNorthLive story about Isaiah Moger's bail, see exhibit 1. Upon inspection, the Facebook story was made public on February 11 at 2:26 PM, see exhibit 2. This is significant because school leadership held a staff meeting that you attended informing all staff not to discuss the events from February 9 specifically with media and any questions should be directed to school leadership.

**Conclusion**

It is our opinion that you have violated the Code of Behavior Standards found on page 15 of the employee handbook and the Social Networking policy on page 28.

By ignoring the school leader's instructions, you have demonstrated insubordinate behavior and violated school policy. The post on UpNorthLive shared information about an active investigation and exhibited opinions made by yourself that is considered harmful to the school's mission.

**Action**

Attached are two documents for your consideration.

If you wish to continue teaching at Old Mission Peninsula School, we are asking that you sign and return the Last Chance Agreement within 24 hours of receiving this email. If you do not feel that you can return to the school under the terms of the Last Chance Agreement, the school is willing to provide a severance to help with your transition.

If there are any questions, please respond to this email.

## Exhibit 1

11:42 5G 96

UpNorthLive

Who sets the bonds over there? They should stay out of the evidence locker stash

Reply 2

**Kilewesu Ndewa**
I didn't read where it said no contact with "students" just teachers and staff..?

Reply

**Mindy Lewis**
He seems pretty happy with the price set.

Reply

**Caitlin Dennis**
Does anyone know WHY he did it? Because the news wont say ...

Reply

> **Hannah OBrien**
> Caitlin Dennis he was an anti-Ice anti- Trump protestor on school grounds Friday, liberals are the most violent
>
> Reply 1
>
> > **Hannah OBrien**
> > Caitlin Dennis by what he did some think he wanted to be on display
> > And some think he was just having a mental episode there's no explanation
> >
> > Reply

**Christina Needham**
Why...is the question?!?!?

Reply 2

Write a comment...

## Exhibit 2




**UpNorthLive**
6d

Wednesday, February 11, 2026 at 2:26 PM hammer to break ... School is being held on a $1 million bond on charges of false report or threat of terrorism and malicious destruction of personal property $1,000-20,000.

He's been identified as Isaiah Moger, 41.

Grand Traverse County Prosecuting Attorney Noelle Moeggenberg said the significant bond based on the seriousness of the offense.

DETAILS: https://upnorthlive.com/...-million-bond-set-for-man ... See more

Like Comment